## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| CABREL JACOMB, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No.: 2:15-cv-02311-JHE |
| | ) | |
| BBVA COMPASS BANK, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION[1]

Plaintiff Cabrel Jacomb ("Jacomb") initiated this action against Defendant BBVA Compass Bank ("BBVA Compass") alleging race discrimination and retaliation in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.*, The Civil Rights Act of 1991, and 42 U.S.C. § 1981. (Doc. 1). BBVA Compass moves for summary judgment on all of Jacomb's claims, arguing there are no genuine issues of material fact and that it is entitled to judgment as a matter of law. (Docs. 15 & 16). Jacomb has filed a response in opposition to the motion, (doc. 20), and BBVA Compass filed a reply brief, (doc. 21). For the reasons explained below, BBVA Compass's motion for summary judgment, (doc. 15), will be **GRANTED**.

### I. Standard of Review

Under Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Rule 56 "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to

---

[1] In accordance with the provisions of 28 U.S.C. § 636(c) and Federal Rule of Civil Procedure 73, the parties have voluntarily consented to have a United States Magistrate Judge conduct any and all proceedings, including trial and the entry of final judgment. (Doc. 10).

establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 447 U.S. 317, 322 (1986). The moving party bears the initial burden of proving the absence of a genuine issue of material fact. *Id.* at 323. The burden then shifts to the nonmoving party, who is required to "go beyond the pleadings" to establish there is a "genuine issue for trial." *Id.* at 324. (citation and internal quotation marks omitted). A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The Court must construe the evidence and all reasonable inferences arising from it in the light most favorable to the non-moving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, (1970); *see also Anderson*, 477 U.S. at 255 (all justifiable inferences must be drawn in the non-moving party's favor). Any factual disputes will be resolved in Plaintiff's favor when sufficient competent evidence supports Plaintiff's version of the disputed facts. *See Pace v. Capobianco*, 283 F.3d 1275, 1276-78 (11th Cir. 2002) (a court is not required to resolve disputes in the non-moving party's favor when that party's version of the events is supported by insufficient evidence). However, "mere conclusions and unsupported factual allegations are legally insufficient to defeat a summary judgment motion." *Ellis v. England*, 432 F.3d 1321, 1326 (11th Cir. 2005) (per curiam) (citing *Bald Mtn. Park, Ltd. v. Oliver*, 836 F.2d 1560, 1563 (11th Cir. 1989)). Moreover, "[a] mere 'scintilla' of evidence supporting the opposing party's position will not suffice; there must be enough of a showing that the jury could reasonably find for that party." *Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990) (citing *Anderson*, 477 U.S. at 252).

## II. Summary Judgment Facts

BBVA Compass is an equal opportunity employer that operates bank branches in several

states throughout the South and West. (Doc. 15-3 at ¶¶1-2). BBVA Compass has a written and well-published Equal Employment Opportunity policy prohibiting any form of discrimination based on race, sex, sexual orientation, color, age, religion, national origin, veteran's status, disability, or any other reason prohibited by law. (*Id.* at ¶2; doc. 15-2 at 16). BBVA Compass also has a Workplace Harassment Policy that prohibits harassment based on, but not limited to, legally protected categories. (Doc. 15-2 at 16). Furthermore, BBVA Compass has a strict policy prohibiting any form of unlawful retaliation. (*Id.* at 18).

Jacomb, an African-American, began working for BBVA Compass in August 2010. (Doc. 15-1 at 11 (36:23-25); doc. 19-1 at 2). Jacomb was hired as a Senior IT Project Manager, (doc. 15-1 at 11 (37:13-15)), which Betsy McCormick[2] referred to as a Senior Project Manager in the "Platform Upgrade Department of the Bank's Technology & Support Services (TeSS)," (doc. 15-3 at ¶2, p.3). At the beginning of her employment, Jacomb acknowledged the availability of, and her agreement to read and abide by, the Employee Handbook and the Workplace Harassment Policy. (Doc. 15-1 at 16 (54:11-20); doc. 15-2 at 27).

Initially, Jacomb's supervisor was Jose Delgado (Hispanic) but, beginning in approximately October 2011, Shannon Rowse (Caucasian) became her supervisor. (Doc. 15-3 at ¶2, p.3). Beginning in approximately December 2012/January 2013, Kristin Julbert (Caucasian) became Jacomb's immediate supervisor. (Doc. 19-1 at 2). Several months later, Jacomb began reporting to Michael Dale (African-American), Application Team Lead, who in turn reported to Angie Simmons (Caucasian). (Doc. 15-1 at 17-18 (60:1-13, 63:1-5)). Dale was Jacomb's immediate supervisor for several months and then, for the last month or two of her employment,

---

[2] Betsey McCormick has been employed with BBVA Compass since June 2001, and has been the HR Business Partner for Engineering (formerly Technology & Support Services) since September 2013. (Doc. 15-3 at ¶1).

Jacomb reported to Barry Lainhart (Caucasian), Business Partner/Project Mgmt. - Manager. (Doc. 15-1 at 18 (63:18-20, 64:13-23); doc. 15-3 at ¶2, p.3).

## A. Jacomb's Performance Evaluation, Attendance Issues, and Complaints of Race-Based Harassment

On or about January 14, 2013, Rowse prepared the calculation sheet for Jacomb's AIM Bonus, based on her assessment of Jacomb's performance for 2012. (Doc. 15-3 at ¶3; doc. 15-4 at 3-4). On or about March 18, 2013, Julbert issued Jacomb her 2012-2013 performance evaluation. (Doc. 15-2 at 34-36). Because at that time Julbert had only been Jacomb's supervisor for about two or three months, she incorporated input from Jacomb's prior managers and from her customers and peers, in addition to her own observations, when preparing the evaluation. (*Id.* at 35). Although Julbert identified issues where she believed Jacomb needed to show improvement, and therefore rated her performance in one category as "Below Expectations," overall she rated Jacomb's performance as "Expected," the same rating Jacomb had received on her previous annual evaluation, when she reported to Rowse. (*Id.* at 35-37). Although the evaluation noted Jacomb's "very frequent absences due to illness or other personal issues," it stated "she typically attempts to work remotely during these times" and that "[t]his willingness to work remotely has been noted." (*Id.* at 36). Any merit-based increase that Jacomb received would have been (and was) based on her overall "Expected" evaluation and not on any individual category within the evaluation. (Doc. 15-3 at ¶4).

Although Jacomb reported Julbert "gave [her] a low evaluation and caused [her] to receive a lower raise and bonus than [she] was due," (doc. 19-1 at 2), she testified she is unaware of how merit raises are calculated. (Doc. 15-1 at 25-26 (93:5-94:1)). Jacomb also testified Julbert would call her names, such as stupid, and say she should "not be working here" and "you are not competent." (Doc. 15-1 at 23 (84:17-20)). Jacomb also states that Julbert would require her to

4

bring a doctor's note if she took scheduled/approved sick leave and to make up the time. (*Id.* at 24 (86:8-21)). BBVA Compass did not have a policy requiring Jacomb to have a doctor's note when she took sick leave. (*Id.*).

On March 20, 2013, in response to an email about time off for a doctor's appointment, Julbert sent Jacomb the following email:

> It's not about a policy. As you and I discussed last week in detail, you are out of the office a lot – more than anyone else on the team. Whether for doctors [sic] appointments or being sick, it is a significant amount of time. It has been almost weekly since you joined my team and as we talked about, your prior management had the same challenges before.
>
> So, if you are going to be out, I would like to either have you take sick time *or* make up the time in the office otherwise I will track both closely. That is part of the reason for me asking for the doctors note. As we also talked about, if your project performance and the feedback I am getting were good, this would be less of a concern. Unfortunately, coupling your frequent absences and the challenges with your performance creates the need or [sic] closer management and direction until the time that we get one or both to where they need to be.
>
> Let me know if you still have questions or concerns and I will be happy to set some time for another in person discussion next week and we can walk through it again.

(Doc. 19-2 at 2) (emphasis added). Jacomb points to several email exchanges prior to March 20, 2013, from other BBVA Compass employees to show "the voluminous amount of positive feedback" she received. (Doc. 20 at ¶9; doc. 19-3 at 22 ("The site really looks good. Great job on this project." From Rowse, February 3, 2012; doc. 19-3 at 27 ("Great job." From Rowse, April 25, 2012); doc. 19-3 at 32 ("This was very well worded for the appointment. Thank you." From Julbert, March 15, 2013); doc. 19-3 at 34 ("I just wanted to tell you what a great job you are doing on this project. I know it often feels like you're trying to 'herd a bunch of cats,' but you're doing a good job of it!" From Debbie Byrd (SVP, Director of Loss Prevention), August 15, 2012); doc. 19-3 at 40 ("Good Job! Thanks!" From Alejandro E. Carriles (Mobile & Internet Strategies - SVP, Director).

There are additional emails from other BBVA Compass employees and team members giving positive feedback for Jacomb, dated March 21, 2013 through March 27, 2013. (Doc. 19-3 at 2, 6, 7, 8, 11). Having received these emails from others, on March 27, 2013, Julbert forwarded Jacomb one of the "feedback" emails she received about Jacomb, with the following text:

> Can you stop by on this today so we can catch up? I really think you have some misunderstandings still about what the issues are that we are still fighting with your performance levels. While I am happy to have feedback like this and the 4 others ones you have asked people to send me (and I will include them in your file for sure), it has little to do with the challenges we are working to fix with your performance. As a result, I really don't think it will be necessary for you to continue sharing the feedback I have received with all of your team members in order to ask they provide their opinion.
>
> Please find 15 minutes on my calendar and book some time for us to speak.

(Doc. 19-13 at 12).

On April 25, 2013, Julbert issued Jacomb a written warning for excessive unscheduled absences. (Doc. 15-1 at 16 (55:11-15)). At another point in time when Julbert was Jacomb's supervisor, Jacomb complained to BBVA Compass's employee hotline about Julbert and her harassment. (Doc. 15-1 at 13-14 (44:15-45:21)). Jacomb also testified she was harassed by Jillian Henning (Caucasian). (Doc 15-1 at 24 (88:6-9). According to Jacomb, Henning told her she would "kick her ass." (*Id.* (88:22-89:8)).

Jacomb took FMLA leave from April 29, 2013 to July 1, 2013. (*Id.* at 17 (58:11-15)). When Jacomb returned from FMLA leave in July 2013, she no longer reported to Julbert. (Doc. 15-1 at 17 (59:17-24)). Beginning in July 2013, Jacomb reported to Group Operations Manager Angie Simmons (Caucasian), who in turn reported to Kevin McMahon (Caucasian). (*Id.* at 17-18 (59:55-60:8, 64:24-65:10)). Jacomb testified Simmons' "tone" was discriminatory and/or harassing. (Doc. 15-1 at 22 (80:2-11)). Jacomb explained "she would actually come out of her office and ask me for things in a harsh way, in front of everyone." (*Id.* (81:5-7)). Jacomb described

it as "hollering."  (*Id.* (81:10)).

Following her return from FMLA leave, Jacomb complained to Human Resources about the April 25, 2013 write-up, and, after investigation and review, Senior HR partner Crystal Berryhill (Caucasian) removed this write-up for absenteeism from Jacomb's personnel file.  (Doc. 19-5 at 2).  Berryhill explained that, although she does not have a way to validate every day Jacomb coded sick time, she would remove the written warning from her file based on the documentation Jacomb provided. (*Id.*).  Between the time she was issued the written warning and the time it was removed, Jacomb did not experience a reduction in her pay, a demotion or any other adverse action as a result of the written warning.  (Doc. 15-1 at 16-17 (55:24-58:10)).

## B.  Jacomb's First EEOC Charge

On September 24, 2013, Jacomb filed a charge of discrimination with the EEOC, alleging she had been discriminated against on the basis of her race.  (Doc. 19-1 at 2).  The Charge states as follows:

1. I am an African-American female and am employed with BBVA Compass as a Project manager.  I have been in this position for over 3 years.

2. In December 2012, I was placed under the supervision of Kristen Julbert (Caucasian).  After Julbert became my supervisor she began to harass me constantly until I went out on medical leave in April 2013.  I believe that this harassment was because of my race.  The harassment consisted of speaking to me in a harsh and demeaning manner, giving me unjustified write-ups, and harassing me about taking sick leave.  She also gave me a low evaluation and caused me to receive a lower raise and bonus than I was due.  Julbert did not treat my Caucasian co-employees in the same harassing manner.  I have also been harassed by another manager Jillian Henning (Caucasian) who has threatened me and stated that she would "kick my ass."  Henning does not speak to Caucasian employees in his manner.  In addition, the authority to manage the budget for my group has been taken away.

3. I believe I have been subjected to a racially hostile work environment and discriminated against because of my race in discipline, evaluation, compensation (raises and bonuses) and other terms and conditions of employment.

(Doc. 19-1 at 2).

## C. Employment After the EEOC Charge, Amended EEOC Charge

On or about December 19, 2013, Simmons prepared the AIM bonus evaluation for the year 2013. (Doc. 15-4 at 6-7). The AIM bonus is comprised of both a score for the individual employee's performance and the Bank's overall performance for the year. (Doc. 15-3 at ¶5). Initially, Jacomb's individual score, and therefore the amount of bonus she received, was lowered slightly based on the assessment of her overall performance by both her current supervisor, Simmons, and her previous supervisor, Julbert. (*Id.*). Simmons presented Jacomb her evaluation and bonus review. (Doc. 15-1 at 27 (100:3-7)).

On January 16, 2014, Jacomb was transferred out of the TeSS Division to the Digital Banking Division. (Doc. 19-6 at 10). The decision to transfer Jacomb was made no later than December 5, 2013. (Doc. 19-7 at 2). The Digital Banking Division was created out of the TeSS Division. (Doc. 19-6 at 11).

On February 28, 2014, Jacomb sent an email to Berryhill, the HR Business Partner, complaining that her 2013 AIM bonus score was unfairly low in retaliation for having filed her September 2013 EEOC Charge. (Doc. 19-6 at 8). After further investigation, the individual-score aspect of Jacomb's AIM bonus was increased to credit her with the reductions that had initially taken place. (Doc. 15-2 at 32). Jacomb's bonus remained lower than it had been the previous year because BBVA Compass's overall performance was not as good and therefore (as with all other employees), Jacomb's bonus was lower. (Doc. 15-3 at ¶5).

On March 25, 2014, Jacomb filed an Amended EEOC Charge, which included a retaliation claim based on allegations arising since the filing of her previous charge, including the evaluation and bonus review. (Doc. 19-14). Notice of the Charge was mailed to BBVA Compass on March

28, 2014.  (Doc. 19-10).  The Amended EEOC Charge states has follows:

> 1. I am an African-American female and am employed with BBVA Compass as a Project Manager.  I have been in this position for over 3 years.  I have a charge currently pending against BBVA Compass.  That charge was filed on September 24, 2013 and the charge number is 420 2013 03310.
>
> 2. After I filed my charge, I received my performance evaluation and bonus for 2013.  The evaluation and bonus were both based upon incorrect project information, some of which was given by my previous manager Kristen Julbert. Julbert was the source of many of the complaints in my pending charge.  I informed Human Resources about this fact, but to date, nothing has been done to correct this. In addition, during my AIM bonus review, I was told by my manager, Angie Simmons, that I was not a "team player."  I believe that this was a reference to the EEOC charge that is currently pending before the Commission.  Prior to this AIM review, during my one on one meetings with my manager I have always asked for feedback or comments on my performance.  The answer has always been "There is nothing you need to work on."  As a result of this negative AIM review my 2013 bonus decreased by over 20% from 2012.  In addition, I have been asked to attend a team building training activity by my current manager.  In addition, my 2012 AIM bonus has not been corrected to reflect the implementation of all my projects which were created under Julbert.
>
> 3. I believed that I have been retaliated against because of my pending EEOC charge in evaluations and compensation (bonuses) and other terms and conditions of employment.

(Doc. 19-14 at 2).  Jacomb testified Simmons refused to explain how Jacomb was not a "team player," and later left her out of a team building exercise.  (Doc. 15-1 at 21-22, 27 (77:24-78-3, 100:19-22)).  Jacomb points to her performance evaluation for April 2012 through March 2013, which states "[Jacomb] routinely exhibits the expected attributes in the area of teamwork."  (Doc. 19-4 at 4).  It also noted she is "a likeable person who generally has a positive relationship with her project team members."  (*Id.*).  This section, however, also explains "[i]t will be important for [Jacomb] to continue to develop relations with her peers though," because her workload is generally lighter than her peers and it has been noted that some of her peers feel as though she is not carrying her share of the project load.  (*Id.*).

On September 5, 2014, Jacomb received an email from Berryhill explaining the results of

the investigation of Jacomb's complaints regarding her AIM bonus. (Doc. 15-4 at 9). Berryhill explained as follows:

> I am reaching out to you regarding information pertaining to your 2013 AIM payout. I understand that you have concerns about two parts of your overall AIM score, and how those scores impacted your 2013 AIM payout. One was the implementation of the picture bill pay pilot, and the other was teamwork.
>
> Human Resources has investigated your concerns, and will be making an adjustment to your 2013 AIM payout in the amount of $573.00. This amount assumes you had scored all available points in the areas of teamwork and implementation of picture bill pay pilot by the set deadline. In addition, your AIM score will be adjusted accordingly. While Human Resources does not believe that you experienced discriminatory treatment or retaliation, it believes that management could have more effectively communicated their expectations to you regarding the picture bill pay pilot and your teamwork. Therefore, the purpose of the AIM adjustment is to make you whole in the two areas where there was a dispute in how you were scored, and thus paid.
>
> In addition to the above, I wanted to point out that based on my investigation, the remainder and largest part of the discrepancy between your 2012 and 2013 AIM payment was based on overall company performance, and had nothing to do with your individual performance or how you were scored in certain categories. There are two components to an employee's AIM payout. One component is the employee's individual performance, and the other is the company's performance. In short, because the company's performance was down from the prior year, you, along with each AIM recipient, were negatively impacted as a result of the company's performance.
>
> You will receive the $573.00 adjustment through normal payroll process on September 30, 2014.

(Doc. 15-4 at 9). The legal department approved this payout. (Doc. 19-13). Jacomb testified she does not know how the bonus is calculated. (Doc. 15-1 at 28 (103:24-104:5)).

### D. Elimination of Jacomb's Position/Termination

In early Spring 2014, BBVA Compass implemented a project, known in the United States as the USA Staffing Plan and in Spain as the Niquel Project ("USA Staffing Plan"), to identify and alleviate redundancies, unused or underutilized resources, and other inefficiencies throughout the organization, with the ultimate goal of streamlining the organization and saving money, thereby

making BBVA Compass more competitive in its respective markets. (Doc. 15-3 at ¶6). As part of the USA Staffing Plan, each division in the organization was tasked with the goal of attempting to reduce its total cost by at least 30%. (*Id.*). These cost reductions could include, but were not limited to, reducing total employee compensation and vendor service expenses; eliminating or streamlining functions and processes; and reducing the number and cost of full-time employees. (*Id.*). Thus, while the primary purpose of the USA Staffing Plan was to eliminate unnecessary or redundant functions and not necessarily entire positions, if all of the primary duties or tasks of a position were no longer needed and/or could be merged into another position, then a position itself might be identified as a candidate for elimination. (*Id.*).

To achieve this goal, division management brainstormed all potential cost-saving measures and then evaluated each measure with respect to its bottom-line impact on improving efficiency and reducing costs, while accounting for the level of risk to the bank (in terms of efficiency, reputation, operations, human capital, and/or regulatory requirements) associated with the potential measure. (*Id.* at ¶7). Once each division at BBVA Compass had conducted its own internal analysis and had identified its proposed measures for attaining the 30% goal, the measures were reviewed with the division head and then submitted to a senior steering committee for consideration and approval or rejection. (*Id.*).

BBVA Compass's Digital Banking Division was no exception to the USA Staffing Plan. (*Id.* at ¶8). In early 2014, the Digital Banking Division was formed out of portions of the TeSS Division and in approximately January/February 2014, Jacomb was officially reassigned from the TeSS Division to the Digital Banking Division. (*Id.*). Other than where her position appeared on an organization chart, the basic duties and responsibilities of Jacomb's position remained unchanged. (*Id.*). Additionally, the organizational baseline used to identify the positions subject

to the USA Staffing Plan was established as of the December 2013/January 2014 timeframe. (*Id.*).

BBVA Compass states that, regardless of the division in which Jacomb's position was organizationally located, it was the duties and responsibilities of the position itself that were evaluated for potential cost reduction under the plan. (Doc. 15-3 at ¶9). Thus, with all other positions in both TeSS and Digital Banking Division (and elsewhere), Jacomb's position – and the duties and responsibilities that comprised that position – were evaluated by management as part of the mandate to reach the 30% cost-reduction goal. (*Id.*).

Over several months, the division managers evaluated every aspect of the divisions at issue and ultimately identified a number of proposed measures to obtain the 30% cost reduction goal. (Doc. 15-3 at ¶9). These measures included, among other things, electing not to backfill several vacant positions and eliminating or reducing personnel support for several functions. (*Id.*). One of the means identified to achieve these cost-saving measures was the elimination of Jacomb's Project Manager position, with assignment to other personnel of any of her duties that could not be eliminated. (*Id.* at ¶10). The initial decision to eliminate Jacomb's position was made at a May 28, 2014 meeting, and published the following week on June 4, 2014. (Doc. 19-12 at 3). An internal email exchange to determine these dates states as follows, from Betsey McCormick to Tim Saylor on Wednesday, July 30, 2014:

> For the D&D employee displacements I need to know when the 'list" was created which included Jimmy Tucker and Cabrel Jacomb. The date is essential as we have some pending items with these 2 employees.

(*Id.* at 4). Later that day, Saylor responded as follows:

> OK, this may not be quite as simple an answer as you had hoped for, but here is what I was able to glean from going through my email traffic. We had a meeting on 5/28 with the D&D team, and at that point we created our first list of potential displacements. I published the first Idea Generation worksheet the following week on 6/4. So, I am not sure which of these dates you would want to use as the "official" date, but hopefully those are close enough together and far enough in the

past to allow you to use either.

(*Id.*).  Once finalized on September 11, 2014, McMahon informed Jacob that her position was

being eliminated effective September 25, 2014.  (Doc. 15-13 at ¶10).

### E.  Second EEOC Charge

On February 20, 2015, Jacomb filed a second EEOC charge, which alleges as follows:

1. I am an African-American female and employed with BBVA Compass as a
Project Manager.  I have been in this position for over 3 years.  I have a race
discrimination charge currently pending against BBVA Compass.  That charge was
filed on September 24, 2013 and the charge number is 420 2013 03310.  I filed an
amendment to that charge on March 25, 2014.

2. On September 11, 2014, I was informed in writing that I was being downsized
due to the elimination of my position in the Technology and Services Support
division effective September 25, 2014.  However, I was not in the Technology and
Services Support Division at the time of my termination, having been transferred
to the Digital Banking Division in February 2014.  To my knowledge, I was the
only Digital Banking Division employee to be eliminated in this reduction.

3. I was told by my immediate manager that the elimination was not based on my
performance and that he had no issues with my performance.

4. I believe that I was terminated in retaliation for my prior protected activity,
including my pending EEOC charge, in violation of Title VII of the Civil Rights
Act of 1964.

(Doc. 15-2 at 4).  Additionally, Jacomb testified her immediate supervisor, Barry Kore, told her

he was only informed that Jacomb's position was being eliminated the same time she found out

and that he had not been consulted.  (Doc. 15-1 at 29 (108:12-22)).  McMahon was among the

division managers who evaluated Jacomb's position for elimination.  (Doc. 19-15 at 4).  Jacomb's

contact with McMahon was limited to monthly committee meetings or calls with him, supervisors,

and project managers.  (Doc. 15-1 at 19-21 (67:1-4, 71:16-19, 74:11-75:3)).  Jacomb testifies that

she was not given an opportunity to speak on these calls "the majority of the time," and when she

did give status reports, McMahon would ask for additional information, but that he did not do this

with other project managers.  (Doc. 15-1 at 19, 21 (68:8-15, 76:22-24)).

### III. Analysis[3]

Jacomb maintains three claims: (1) retaliatory lowering of her 2013 AIM bonus in February 2014, (2) retaliatory discharge in September 2014, and (3) a racially hostile work environment. (Doc. 20 at 12, 23).  Jacomb abandons all other claims, and, as such, those claims will be dismissed. *See Adkins v. Christie*, 491 Fed. Appx. 996, 998 (11th Cir. 2012) (unpublished).

### A.  Retaliation Claims

"Title VII prohibits . . . retaliation against an employee who has opposed any unlawful employment practices or who has made a charge, testified, assisted, or participated in any manner in a Title VII proceeding." *Sapp v. U.S. Attorney General*, No. 16-11761, 2017 WL 217978, *2 (11th Cir. Jan. 19, 2017) (citing 42 U.S.C. §§2000e-2(a)(1), 2000e-3(a)).  Title VII retaliation claims generally "require proof that the desire to retaliate was the but-for cause of the challenged employment action." *Univ. of Texas Sw. Med. Ctr. v. Nassar*, — U.S. —, 133 S. Ct. 2517, 2528 (2013).  Where, as here, a plaintiff relies on circumstantial evidence, the burden-shifting *McDonnell Douglas* framework is the guide.  *See Pennington v. City of Huntsville*, 261 F.3d 1262, 1266 (11th Cir. 2001).  Under this framework, the plaintiff must first make a *prima facie* case of retaliation by presenting evidence (1) she engaged in a statutorily protected activity; (2) she suffered an adverse action; and (3) there is a causal connection between the protected activity and the adverse action. *See Brown v. Ala. Dept. of Transp*., 597 F.3d 1160, 1181 (11th Cir. 2010).  If the plaintiff establishes a *prima facie* case, this triggers the defendant's burden of articulating a

---

[3] Other than the administrative exhaustion requirement, Title VII and § 1981 claims have the same requirements of proof and use the same analytical framework.  *See Standard v. A.B.E.L. Servs., Inc.*, 161 F.3d 1318, 1330 (11th Cir. 1998).  Therefore, the undersigned will expressly address the Title VII claims with the understanding the analysis applies to the § 1981 claims unless indicated otherwise.

legitimate, non-retaliatory reason for the adverse employment action. *Pennington*, 261 F.3d at 1266. If the defendant satisfies its burden, then the plaintiff must provide sufficient evidence the defendant's proffered reason is merely a pretext for retaliation. *Id*.

Jacomb asserts that, after she filed an EEOC Charge (and an amendment thereto), she was retaliated against when she (1) received a lower AIM bonus amount in February 2014, and (2) was terminated in September 2014. (Doc. 20 at 12).

### 1. Lower AIM Bonus Amount in February 2014

Jacomb engaged in protected conduct when she filed an EEOC Charge on September 24, 2013. Thereafter, on or about December 19, 2013, Simmons prepared the AIM bonus evaluation for the year 2013. (Doc. 15-4 at 6-7). Initially, Jacomb's individual score, and therefore the amount of bonus she received, was lowered slightly based on the assessment of her overall performance by both her current supervisor, Simmons, and her previous supervisor, Julbert. (Doc. 15-3 at ¶5). Jacomb contends she suffered an adverse action by losing out on $573.00 in bonus money, that she was later awarded after lodging an internal complaint. (Doc. 20 at 23). Jacomb does not request the court infer a causal connection based on a close temporal proximity between the protected activity and adverse employment action, but contends Simmons' statement that Jacomb was not a "team player" and the fact Simmons provided no specifics about the basis for that statement is evidence of a causal connection between her EEOC charge and the lower bonus. (*Id*.). Jacomb argues Simmons' team-player comment, along with Julbert's input into her evaluation and the fact she later received the $573.00 bonus adjustment is evidence of pretext. (*Id*. at 23-24).

BBVA Compass contends Jacomb's evidence falls short of establishing pretext, contending Jacomb's individual evaluation score was lowered slightly (and therefore her bonus

was slightly less) based on the assessment of her overall performance, and she was later awarded the difference because "management could have more effectively communicated their expectations to [her]." (*See* doc. 21 at 11-13; doc. 15-3 at ¶5; doc. 14-4 at 9).

Assuming Jacomb can establish a *prima facie* case for retaliation, she fails to present evidence from which a reasonable jury could infer that BBVA Compass's legitimate, non-retaliatory reason was a pretext for discrimination. First, as to Simmons' team-player comment, there is no evidence Simmons made any specific reference to the fact Jacomb had filed an EEOC Charge or an internal complaint. To the contrary, this conversation took place during Jacomb's annual performance evaluation, which included a review of "teamwork" and evaluated Jacomb's contribution. (Doc. 19-4 at 4). Jacomb's former supervisor Julbert noted Jacomb was well-liked by her peers but that "[i]t will be important for [Jacomb] to continue to develop relationships with her peers though. Because her workload is generally lighter than that of her peers and also because she is frequently out of the office, it has been noted that some of [Jacomb's] peers feel as though she is not carrying her share of the project load . . . ." (*Id.*). The evaluation also noted that "[t]he fact that some mobility projects recent had to be moved from [Jacomb's] responsibility to other project managers has furthered this opinion," (*Id.*). The "teamwork" evaluation listed three ways that Jacomb could improve, including: (1) being present in the office; (2) improving the effectiveness of her management of projects, and (3) working to better integrate herself in the details of the projects so she can relate to, understand, and proactively assess the impact that project issues will have on the overall project timeline. *Id.* The 2013 evaluation, specifically the teamwork section assessment" is consistent with the positive emails Jacomb asked her colleagues to send to Julbert in March 2013. (*See* doc. 19-13 at 12). The emails show Jacomb was well-liked by her peers, but that, as Julbert pointed out in her March 27, 2013 email, that "has little to do with

the challenges we are working to fix with your performance." (*Id.*). To the extent Jacomb argues she was not aware of any performance deficiencies, that assertion is not supported by the record. (*See id.*). Furthermore, Julbert's input and participation in the evaluation does not demonstrate pretext. Julbert was one of Jacomb's supervisors during the time-period covered by the evaluation and would be expected to participate in the evaluation process.

Finally, Jacomb offers no evidence that the subsequent increase to her bonus was "due to the wrongful actions of her supervisors" as she conclusorily states in her brief. (Doc. 20 at 23). In Berryhill's follow-up email to Jacomb about the Human Resources investigation into her 2013 AIM Bonus, Berryhill explained she understood Jacomb had concerns with two parts of her AIM score: the implementation of the picture bill pay pilot and teamwork. (Doc. 15-4 at 9). Berryhill explained that Human Resources did not believe Jacomb experienced any discriminatory treatment or retaliation, but that it believed management could have done a better job communicating expectations in these areas, and that the adjustment was intended to make her "whole" in the two areas where there was a dispute as to how she was scored and thus paid.[4] (*Id.*).

Accordingly, because Jacomb cannot demonstrate pretext in BBVA Compass's action regarding her 2013 AIM bonus, and BBVA Compass is entitled to summary judgment on claims arising out of an alleged retaliatory bonus deduction.

### 2. Termination/RIF in September 2014

As with Jacomb's previous retaliation claim, BBVA Compass argues Jacomb as failed to offer evidence to support the causal connection element of her *prima facie* case and failed to

---

[4] The "communications" issue rationale is further supported by the March 27, 2013 email from Julbert explaining: "Can you stop by on this today so we can catch up? I really think you have some misunderstandings still about what the issues are that we are still fighting with your performance levels." (Doc. 19-13 at 12).

present sufficient evidence of pretext. (*See* doc. 21 at 2-11). To establish the causal connection element of a *prima facie* case of retaliation, a plaintiff must demonstrate that "but for" her protected conduct, she would not have been terminated. Generally, "close temporal proximity between the employee's protected conduct and the adverse employment action is sufficient circumstantial evidence to create a genuine issue of material fact about a causal connection," but to satisfy this showing, a plaintiff must also establish "that the decision maker was aware of the protected conduct at the time of the adverse employment action." *Brungart v. BellSouth Telecomms., Inc.*, 231 F.3d 791, 799 (11th Cir. 2000).

Jacomb filed her first EEOC charge in September 2013, and the decision to eliminate her position was made on May 28, 2014, and published on June 4, 2014; a span of almost nine months. Such a temporal gap does not create an inference of causation. *See Srungart v. BellSouth Telecomms., Inc.*, 231 F.3d 798-99 (11th Cir. 2000). Jacomb points to the fact she filed an amended EEOC Charge on March 25, 2014, about two months before the decision was made to eliminate her position. (Doc. 20 at 7, 13-14). However, even a two-month gap has been seen as insufficient to create an inference of causation. *See Billingsley v. Mercedes-Benz U.S., Int'l, Inc.*, No. 7:15-cv-00840-RDP, 2016 WL 5341101, *6 (N.D. Ala. Sept. 23, 2016) (citing *Williams v. Waste Mgmt., Inc.*, 411 Fed. Appx. 226, 229-30 (11th Cir. 2011)) ("However, a two month gap between the two events has been found to be enough of a delay to preclude an inference of causation.").

Even assuming it could be said that the temporal proximity between Jacomb's EEOC charge/amended EEOC charge and her termination was close enough to raise an inference of causation, temporal proximity alone is insufficient to create a genuine issue of fact as to causal connection where there is no evidence the decision maker had knowledge that the employee

engaged in protected conduct. *See Goldsmith v. Bagby Elevator Co.*, 513 F>3d 1261, 1278 (11th Cir. 2008). As to the burden at summary judgment, "[a]lthough the moving party bears the burden of demonstrating that no genuine issue of material exists, the non-moving party must make a sufficient showing on each element of the case. *Marria v. C.R. Eng. Inc.*, No. 15-14453, 2017 WL 541400, *2 (11th Cir. Feb. 10, 2017). BBVA Compass told the EEOC that McMahon was involved in the decision to eliminate Jacomb's position, (doc. 19-15 at 4). McMahon, a division manager, was a supervisor three levels of above Jacomb in the chain-of-command. (*Id.*; doc. 15-1 at 18 (64:24-65:7)). There is no direct evidence McMahon or any other decision-maker knew Jacomb had filed an EEOC Charge in September 2013 and an amended EEOC Charge in March 2014. However, based on his position and participation in evaluating Jacomb's position, for the purposes of summary judgment, it is a reasonable inference to conclude that McMahon knew of Jacomb's complaints. Evidence related to comments made by individuals who were not decision-makers does not bear on the causation analysis, but will be addressed below to the extent they may establish pretext.

Assuming Jacomb could present a *prima facie* case of retaliation, the burden shifts to BBVA Compass to provide a legitimate, non-discriminatory reason for its employment action, here, its decision to eliminate Jacomb's position, terminating her employment. *EEOC v. Joe's Stone Crabs, Inc.*, 296 F.3d 1265, 1272 (11th Cir. 2002). BBVA Compass maintains that Jacomb's position was eliminated as part of its USA Staffing Plan, which was aimed at across-the-board cost reductions. (*See* doc. 15-3 at ¶¶6-8). BBVA Compass further states that, regardless of the division in which Jacomb's position was organizationally located (TeSS or Digital Banking), it was the duties and responsibilities of the position itself that were evaluated for potential cost reduction under the plan. (Doc. 15-3 at ¶9). The burden now shifts back to Jacomb to offer evidence BBVA

Compass's reason is a pretext for discrimination. *See Joe's Stone Crabs, Inc.*, 296 F.3d at at 1272-73.

To demonstrate pretext, Jacomb must offer evidence that BBVA Compass's stated reason for her termination was false *and* that retaliation was the real reason for eliminating her position. *Brooks v. Cnty. Comm'n of Jefferson Cnty., Ala.*, 446 F.3d 1160, 1163 (11th Cir. 2006). She may prove this by offering affirmative evidence retaliation played an impermissible role in the decision or by showing the proffered nondiscriminatory reason does not merit credence. *Lincoln v. Bd. of Regents of Univ. Sys. of Ga.*, 697 F.2d 928, 938 (11th Cir. 1983). Thus, Jacomb must show "'such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable fact finder could find them unworthy of credence.'" *McCann v. Tillman*, 526 F.3d 1370, 1375 (11th Cir. 2008), *cert. denied*, 555 U.S. 944 (2008) (quoting *Cooper v. Southern Co.*, 390 F.3d 695, 740 (11th Cir. 2004)). Jacomb points to the following as evidence of pretext: (1) the timing of the decision; (2) Simmons' comment she was not a "team player," (3) internal emails showing an uncertainty as to whether the decision date or the publication date was the official date Jacomb's position was selected for elimination and reference to a "pending item," (4) a question as to Jacomb's division, TeSS or Digital Banking, at the time of her termination, and (5) the way McMahon treated Jacomb and her testimony as to whether he knew the reason. (Doc. 20 at 20-22).

Jacomb's proposed evidence of pretext falls short. As discussed above, the timing of the decision is not apparently suspect. Jacomb filed her first EEOC charge in September 2013, and the decision to eliminate her position was made on May 28, 2014, and published on June 4, 2014; a span of almost nine months. Even considering Jacomb's amended EEOC charge, which was filed on March 25, 2014, two months passed before the decision was made to eliminate her

position. (Doc. 20 at 7, 13-14). As to Simmons' comment about Jacomb not being a team player, which was made between the time the original and amended EEOC charges were filed, there is no evidence Simmons was involved in the decision-making process that selected Jacomb's position for elimination. As an isolated remark, "unrelated to the challenged employment decision," the comment has no probative value as to pretext. *See Richie v. Industrial Steel*, 426 Fed. Appx. 876, 873 (11th Cir. 2011).

Next, Jacomb points to the email exchange between McCormick and Saylor referring to a "pending item" arguing "HR was concerned about the date Jacomb was selected for elimination . . . so much that it inquired . . . to determine the date." (Doc. 20 at 17-18). There is no evidence that either Saylor or McCormick was a decision-maker in selecting Jacomb's position for elimination. The evidence does show that, several months before, Jacomb had challenged the amount of her AIM bonus and the complaint had not been resolved. To extrapolate a retaliatory motive from this exchange requires speculation.

Jacomb's contention that there is a question of fact as to which division she was a part of at the time is not compelling. Jacomb attempts to highlight conflicting evidence by pointing to an interrogatory response that says she was transferred from the TeSS Division on January 16, 2014, while McCormick's declaration states it occurred in "approximately February 2014." This is not a smoking gun or genuine issue of material fact. These answers are consistent. To Jacomb's contention that email correspondence suggests the decision to transfer her to the Digital Banking Division was made in December 2013, this is consistent with BBVA Compass's position that "the organizational baseline used to identify positions subject to the USA Staffing Plan was established as of the December 2013/January 2014 timeframe, prior to the reassignment . . . ." (Doc. 15-3 at ¶8). Jacomb's contention she was the only Digital Banking employee who was terminated and

that the other positions that were eliminated were vacant positions that were not backfilled is equally unfounded. The emails Jacomb cites do not support her contention. (Doc. 19-12). To the contrary, the emails indicate three other employees in the division are listed as "displacements." (Doc. 19-12 at 3). These three employees, among others in the TeSS Division, were identified in BBVA Compass's response to a request for information from the EEOC. (Doc. 21-1 at 3-4).[5]

Jacomb next argues that McMahon "apologized for her elimination and said he did not know why she was being eliminated." (Doc. 20 at 9, 22). This contention is based on a mischaracterization of Jacomb's deposition testimony. Jacomb's testimony was that *after* McMahon informed her of her discharge, she had a conversation with *Michael*, a former supervisor, and it was Michael who apologized and stated that he did not know why her position was being eliminated. (Doc. 15-1 at 30 (113:10-114:5)). Jacomb also testified her immediate supervisor at the time, Lainhart, stated he had no issues with her performance, (doc. 15-1 at 28-29 (105:22-106:4)), but there is no testimony that McMahon made any such statement. Jacomb testified she did not recall whether McMahon said anything about her termination being performance-related. (*Id.* at 30 (110:15-111:13)). Additionally, the evidence McMahon did not allow Jacomb to give reports during monthly conference calls is not probative of pretext.

Summary judgment is due to be granted on Jacomb's claims for retaliation based on her termination. The evidence of causation is at most tenuous, with a two-month gap between her amended EEOC charge and the decision to select her position for elimination. Furthermore, even assuming Jacomb could establish causation and a *prima facie* case, considering all of Jacomb's arguments and evidence, she fails to provide evidence that BBVA Compass's proffered reason for

---

[5] The court accepts BBVA Compass's supplementary evidence offered to rebut Jacomb's unsupported assertion that no other Digital Banking Division (or TeSS Division) employees were terminated.

eliminating her position is false and fails to provide evidence that the real reason was retaliatory.

## B. Racially Hostile Work Environment Claim

Title VII prohibits an employer from discriminating against an employee because of the employee's race, color, religion, gender, or national origin. *See* 42 U.S.C. § 2000e-2(a). To establish a hostile work environment claim,[6] Jacomb must show her "workplace [was] permeated with discriminatory intimidation, ridicule, and insult that [was] sufficient severe or pervasive to alter the conditions of [her] employment and create an abusive work environment." *Miller v. Kenworth of Dothan, Inc.*, 277 F.3d 1269, 1275 (11th Cir. 2002) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)). To do so, Jacomb must present evidence: (1) she belongs to a protected group; (2) she was subjected to unwelcome harassment; (3) the harassment was based on a protected characteristic, i.e., her race; (4) the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatory abusive work environment; and (5) the employer is responsible for such environment under either a theory of vicarious or direct liability. *Id.*; *see Adams v. Austal, U.S.A., LLC*, 754 F.3d 1240, 1248 (11th Cir. 2014) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)).

Jacomb alleges Julbert, Henning, Simmons, and McMahon harassed her. (Doc. 20 at 27). Jacomb admits she was not subjected to harassment in the form of discriminatory slurs or graffiti, but subjected to "overall racially discriminatory treatment in the workplace." (*Id.* at 28). Jacomb presents evidence Julbert spoke to her in "a harsh and demeaning manner" and called her "stupid" and said she should "not be working here" and that she was "not competent." (Doc. 15-1 at 23(84:17-20); doc. 19-1 at 2). Jacomb also testifies Julbert would require her to bring a doctor's

---

[6] A hostile work environment claim based on racial harassment is reviewed under the same standard as a claim based on sexual harassment. *See Faragher v. Boca Raton*, 524 U.S. 775, 786-87 and n.1 (1998); *Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 66-67 (1986).

note if she took scheduled/approved sick leave (which was not required of other employees) and/or to make up the time, which culminated in a written warning for absenteeism that was later rescinding by HR. (Doc. 19-1 at 2). Jacomb also contends Julbert gave her a lower evaluation than she was due. (*Id.*). Without specifics, Jacomb states Julbert did not treat Caucasian employees in a similar manner. (Doc. 19-1 at 2). Jacomb testifies that Henning told her she would "kick her ass" on one occasion. (Doc. 15-1 at 24 (88:22-89:8)). Jacomb testified she never heard Henning speak to any of her Caucasian employees in a similar manner. (Doc. 15-1 at 25 (90:20-22)). However, Jacomb also testified she never heard Henning speak this way to other African-Americans. (*Id.* (90:20-91:11)). As to Simmons, Jacomb testified Simmons spoke to her in a tone that was discriminatory and/or harassing. (Doc. 15-1 at 22 (80:2-11)). Jacomb explained "she would actually come out of her office and ask me for things in a harsh way, in front of everyone" and described it as "hollering." (*Id.* (81:5-10)). Jacomb also testifies Simmons refused to explain how Jacomb was not a "team player," and later left her out of a team building exercise. (Doc. 15-1 at 21-22, 27 (77:24-78-3, 100:19-22)). Jacomb's brief provides no citation for her assertion Simmons did not treat Caucasians in a similar manner. (Doc. 20 at 30). Finally, Jacomb testifies McMahon did not give her an opportunity to speak on team calls "the majority of the time," and when she did give reports, he would ask for additional information, but that he did not do this with other project managers. (Doc. 15-1 at 19, 21 (68:8-15, 76:22-24)). BBVA Compass moves for summary judgment on this claim contending, *inter alia*, that Jacomb has not presented evidence to establish the alleged harassment was based on Jacomb's race. (Doc. 16 at 15-18; doc. 2113-15).

### 1. Based on a Protected Characteristic – Jacomb's Race

Jacomb must present evidence from which a reasonable jury could conclude that the

alleged harassment was *based on her race*, as opposed to merely stemming from incivility. *Gooden v. Internal Revenue Service*, No. 15-14225, at \*6 (11th Cir. Feb. 17, 2017). As with gender-based harassment, race-based harassment does not need to have clear racial overtones, but may be based on any harassment or unequal treatment that would not have occurred but for the race of the employee. *Henderson v. Leroy Hill Coffee Co., Inc.*, No. Civ. A. 99-1067-CBS, 2001 WL 103147, at \*7 (S.D. Ala. Jan. 30, 2001) (citing *Cross v. State of Ala.*, *State Dept. of Mental Health & Mental Retardation*, 49 F. 3d 1490 (11th Cir. 1995)). However, "[i]nnocuous statements or conduct, or boorish ones that do not relate to the [race] of the actor or of the offended party . . . are not counted." *Gupta v. Fla. Bd. of Regents*, 212 F.3d 571, 583 (11th Cir. 2000), *abrogated on other grounds*, *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53 (2006).

Jacomb's testimony that, on occasion, her supervisors were rude, curt, harsh, or even disrespectful to her, with no reference to race in their comments or conduct, is not the type of behavior Title VII is designed to prohibit. The comments from Julbert, Simmons, and treatment by McMahon all are focused on Jacomb's job performance. There is no evidence of "race-based harassment," only Jacomb's subjective interpretation and personal speculation as to why they acted this way. *See Henderson*, 2001 WL 103147 at \*7. Jacomb's testimony that Julbert did not treat Caucasian employees this way and that McMahon did not prevent other employees from speaking on calls or demand more information from other employees lacks any specifics from which a fact-finder could infer that treatment was based on race. Jacomb also testified that although she never heard Henning threaten any Caucasian employees, she also testified she never heard Henning threaten anyone and that she never heard Henning make any reference to her race or to race in general. (Doc. 15-1 at 24-25 (88:6-91:11)). Because there is insufficient evidence from which a fact-finder could infer that the alleged harassment was based on Jacomb's race, BBVA's motion

for summary judgment as to Jacomb's claims based on a racially hostile work environment will be **GRANTED**.

## IV. Conclusion

Finding no genuine issue of material fact, BBVA Compass' motion for summary judgment (doc. 15) is **GRANTED**.  A separate order will be entered.

DONE this 14th day of March, 2018.

_____
**JOHN H. ENGLAND, III**
UNITED STATES MAGISTRATE JUDGE